## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

DERRICK McKINSEY                                    CIVIL ACTION

VERSUS                                             NO.  09-7729

BURL CAIN, WARDEN                                  SECTION "R"(2)


## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  It has since been reassigned to me.   Record Doc. No. 13.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1] For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and the petition **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

I.     FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Derrick McKinsey, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On May 18, 1995, McKinsey and two co-defendants, Marquette Grandprix (a/k/a Marquette Grandpre) [hereinafter "Megat"] and Arthur Grandprix (a/k/a Arthur Grandpre), were indicted by a grand jury in Orleans Parish for the first degree murder of Eric Lewis during an attempted armed robbery and/or in which they had specific intent to kill or inflict great bodily harm on more than one person.[3] The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as follows:

> Officer Darryl Odom testified that on March 14, 1995, he and Officers Guillot, Smith, Thompson and Mungia were assigned to the Fourth District Task Force, investigating narcotics activity in Algiers. At approximately 10:30 p.m. that night, while executing a drug stop at the intersection of General Meyer Avenue and Boyd Street, they heard two instances of rapid gunfire. Officers Thompson and Mungia, in an unmarked Black Ford Taurus, followed by Officers Guillot, Smith and Odom, in a marked police unit, decided to investigate, and drove down General Meyer in the direction of the gunfire. As they approached the intersection of General Meyer and Ernest Street, they observed a young male pedestrian, running on General Meyer away from Kent Street, pursued by the occupants of an Oldsmobile Cutlass. The defendant, who was seated in the front passenger seat of the Oldsmobile, was shooting at the pedestrian. When the Oldsmobile driver, Marquette Grandpre, noticed the approaching police vehicles, he and the defendant began shooting at the officers. Grandpre attempted to elude the police by driving over the General Meyer median, but blew out all four tires. The Oldsmobile continued to roll until it hit a fence. While the Oldsmobile was still rolling, Grandpre jumped out and ran to the rear of the vehicle. Grandpre and the defendant continued to shoot at the officers, who returned fire, wounding Grandpre. As the officers converged on the Oldsmobile, the defendant jumped

---

[2]Rec. Doc. No. 3.

[3]St. Rec. Vol. 1 of 7, Indictment, 5/18/95.

out and lay in a prone position on the ground.  Officer Odom retrieved a loaded Colt .45 from the passenger front seat and a Halloween-type mask, a ski mask and a loaded nine-millimeter Beretta from the back seat.  They also confiscated a nine-millimeter handgun from Marquette Grandpre, who was wounded, and called for emergency medical assistance.

Officer Richard Mungia testified corroborating Officer Odom's testimony.  He noted that as soon as Grandpre and the defendant noticed the approaching police vehicles, they began firing upon the officers.  Officer Mungia assisted in the apprehension of Arthur Grandpre on March 28, 1995, as he was walking in the 2000 block of Whitney Avenue.  At the time of his arrest, Arthur Grandpre was armed with a .45 Ruger.

Officer James Ducos of the NOPD crime lab testified that on March 15, 1995, he processed the Oldsmobile Cutlass used in the shooting incident.  While he was unable to lift any fingerprints from the vehicle, he did find a nine-millimeter casing under the driver side floor mat.

Officer Kenneth Leary, firearms expert, testified that his duties entail linking bullets and bullet casings to particular firearms, to the exclusion of all other weapons.  Officer Leary compared a Glock .40-caliber semiautomatic pistol and Cobray nine millimeter semiautomatic pistol (both found in the victim's possession); a Taurus nine-millimeter semiautomatic pistol, a nine-millimeter Beretta, a Colt .45-caliber semiautomatic pistol, and a Ruger .45-caliber semiautomatic pistol with bullets and bullet casings recovered from 2840 Kent Street (the murder scene) and from the General Meyer and Ernest Street shooting scene and the impounded Oldsmobile Cutlass.  He concluded that the Glock .45-caliber semiautomatic pistol fired some of the bullet casings found at the murder scene; the Taurus nine-millimeter semiautomatic pistol fired other casings found at the murder scene as well as casings retrieved from the impounded Oldsmobile; the Beretta nine-millimeter fired casings retrieved from the General Meyer and Ernest Street scene and the murder scene, as well as the bullet recovered from the victim's body; and the Ruger .45-caliber pistol fired casings retrieved from the murder scene.

Dr. Paul McGarry, forensic pathologist with the Orleans Parish Coroner's Office, testified that he performed an autopsy on the body of the victim, Eric Lewis. Dr. McGarry determined that the victim suffered three gunshot wounds – the fatal wound to the left side of his head, another to his right front chest, and another to his right leg.  Tests on the victim's blood were negative for alcohol and drugs; however, a urine sample tested positive for the presence of cocaine.

Officer Millard Green, NOPD crime scene technician, testified that his duties involve processing a crime scene for evidence, including testing for fingerprints, and photographing and sketching the scene.   He identified photographs he took of the scene depicting bullet holes in the Oldsmobile vehicle,

a knit cap, mask and nine-millimeter gun discovered in the Oldsmobile's back seat, spent casings on the floor of the passenger side of the car, and spent casings in various positions outside the Oldsmobile.  Officer Green also identified the nine-millimeter Beretta semiautomatic gun retrieved from the rear seat of the Oldsmobile.

Officer Terence Allen, NOPD crime technician, testified that he gathered evidence from, and photographed the murder scene at 2840 Kent Drive on the night of March 14, 1995.  He recovered numerous bullet casings and live rounds that night, including four spent .45-caliber bullet casings, two inside the victim's bedroom and two in the driveway, as well as several pieces of rock cocaine, a triple-beam scale and marijuana, also found in the victim's room. Officer Allen recounted that the victim's vehicle, parked in front of his house, sustained a bullet hole, which shattered (sic) windshield.  He recovered a spent pellet from the front passenger side floorboard of the car.

Homicide Detective Arthur Kaufman testified that he took a typewritten statement from the defendant on the night (sic) the murder.  He also identified the typewritten statement and the clothing worn by the defendant when he was arrested.

Leonard West, the victim's next door neighbor, testified that he was at the Lewis residence, with Lance Lewis, one of the victim's brothers, at about 7:00 p.m. on March 14, 1995, watching television.  The victim's other brothers, Darryl and Gary, were also in the house, as was their sister Dana Lewis.  West heard the victim's car drive up, so he (West) opened the door to admit the victim.  As West did so, he saw three or four men approaching the house.  The victim told him to get back in the house and said "That's them-that's Peanut[4] and them."  The victim was scared, and ran into the house.  West ran into the hallway, stopped briefly and saw the men kick open the front door.  At that point he ran out of the Lewis residence and to his house next door.  As he entered his house, he heard gunfire in the Lewis residence.  His uncle turned out the lights while he and his grandmother lay on the floor.

Dana Lewis testified that she lived at 2840 Kent Street with her parents and her brothers, Eric, Lance, Gary and Darryl.  On the night Eric was killed, her parents were not at home.  She was watching television in her room when she heard noises in the front of the house, and decided to investigate.  Three masked men were in the front room asking for Eric.  They ordered her, Gary and Darryl to lie on the floor.  The masked men then took Gary to the wash room.  When she and Darryl heard gun shots, they ran into her room, closed the door, and called the police.  Darryl stayed with her a few minutes, and then left her room.  When he

---

[4] "'Peanut' is the defendant's nickname." (footnote in original text).

did so, she heard more gunfire. She remained in her room for a brief period after the second burst of gun shots, and then ran out the front door, and across the street to a friend's house. Dana Lewis denied that she and her brothers ever sold or used drugs. She further testified that she never saw the victim with a gun.

Gary Lewis testified that he was asleep in his room the night his brother was killed. He was awakened by noises coming from the living room. When he walked to the front of the house, he encountered four armed men. The defendant and one of the other men took him to the wash room, and told him to kick open the door. He kicked the door twice and then moved to the side. One of the armed men eventually kicked the door open and gunfire erupted. He could see that his brother had been shot, and in the confusion, he elbowed the defendant out of the way and ran out the side door of the house. He gave the police a description of the defendant's clothing, hair cut and build the night of the murder. Later that night, at the police station, he identified the defendant as one of the assailants who entered his house and shot his brother.

Darryl Lewis testified that he and his next door neighbor, Leonard West, were watching television at the Lewis residence the night Eric was murdered. As he and West watched television, he heard his brother's car stop in front of their house. Eric ran into the house saying, "That's Peanut and Megat." Eric ran into his room; Leon West ran out the side door and Darryl ran into the kitchen. Four masked, armed men kicked open the front door, and ordered Darryl, Gary and Dana to lie on the floor. Next, one of the gunmen grabbed Gary and took him to the utility room, telling him to tell Eric to open the door. Darryl heard someone say, "Get him", and then he heard gunshots. After that, Peanut and Megat[5] exited the house through the front door, and Darryl and Dana ran to Dana's room to call the police. As Darryl stood in the hallway peeking outside, Peanut shot at him.

Darryl waited a few minutes and ran to the front of the house. Shots fired from outside entered the house hitting Eric in his leg. Darryl exited the front door, and ran towards a neighbor's fence. As he did so, a blue Oldsmobile backed out of an adjacent driveway, and began chasing him. Peanut, sitting in the front passenger seat, began shooting at him. He ran on Ernest Street toward General Meyer.

Darryl knew Megat from a neighborhood park and recognized the defendant as Peanut. He gave the police clothing and physical descriptions of Peanut and later that night he saw Peanut at police headquarters. Darryl identified the clothing worn by the defendant on the night of the murder. He is sure of Peanut's and Megat's identities because as they left the Lewis residence, they removed their masks and Darryl saw their faces.

---

[5]"Megat is the nickname of one of the co-defendants." (footnote in original text).

Lance Lewis testified that he was bathing when he heard his brother, Eric, enter the house and say, "That's Peanut and Megat." Eric ran to his room, and, two males Lance had never seen before kicked open the front door and pursued Eric to his room. Eric exchanged gunfire with the intruders, who then ran out the front door. When the gunfire stopped, Lance entered Eric's room to see what happened. As he did so, gunshots were fired from outside the house into Eric's room, wounding Eric. Shortly thereafter, Arthur Grandpre entered Eric's room, and shot Eric twice at point blank range. Arthur then ordered Lance to give him Eric's money. After Lance complied, Arthur shot Lance five times, and then left the house.

The defense called Calvin "Chris" Kelly who testified that on the night of March 14, 1995, he was driving down Ernest Street when the defendant flagged him down, and asked for a ride. As the two spoke, they heard "a lot of popping" which sounded like firecrackers. After about a minute, another car pulled up behind Kelly's vehicle and the defendant got into that vehicle and left. Kelly knew the defendant by his nickname "Peanut."

The defendant testified that on the night of March 14, 1995, he was walking on Ernest Street on his way to get ice cream for his son. He stopped Chris Kelly as Kelly drove by, and asked for a ride home. When Kelly told him he was not going that way, the defendant noticed Megat's car turning the corner, so he flagged down Megat, who was driving a blue Oldsmobile, and got into the car. As the defendant got into the car, he heard gunshots, and saw a man running on the sidewalk. The defendant ducked down in the car and when he came up the police were right there. He gave a statement to the police but only after they told him they would charge him with murder unless he named the shooter. Moreover, he stated that the police supplied some of the information found in his statement. He denied that he ever went to the Lewis residence to buy drugs and stated that he had nothing to do with the shooting.

(footnotes in original) State v. McKinsey, 779 So.2d 993, 994-98 (La. App. 4th Cir. 2001); State Record Volume 6 of 7, Louisiana Fourth Circuit Court of Appeal Opinion, 2000-KA-0406, pp. 1-8, January 17, 2001.

On March 3 and 5, 1997, the jury trial of Marquette and Arthur Grandprix commenced. [6] The state trial court declared a mistrial on March 5, 1997, and ordered the trial reset.[7]

McKinsey was tried before a jury on September 22, 23, and 24, 1997, and the jury could not reach a verdict.[8]  On March 23, 1998, the State amended the indictment to charge McKinsey with second degree murder.[9]  He again was tried before a jury on March 23, 25, 26, 1998, and he was found guilty as charged of second degree murder.[10]

On August 28, 1998, both Marquette and Arthur Grandprix entered guilty pleas to amended charges of manslaughter.[11]  Both men received sentences of 25 years at hard labor.[12]

---

[6]St. Rec. Vol. 1 of 7, Trial Minutes, 3/3/97; Trial Minutes, 3/5/97.

[7]St. Rec. Vol. 1 of 7, Trial Minutes, 3/5/97.

[8]St. Rec. Vol. 1 of 7, Trial Minutes, 9/22/97; Trial Minutes, 9/23/97; Trial Minutes, 9/24/97.

[9]St. Rec. Vol. 1 of 7, Trial Minutes, 3/23/98.

[10]St. Rec. Vol. 1 of 7, Trial Minutes, 3/23/98; Trial Minutes, 3/25/98; Trial Minutes, 3/26/98; St. Rec. Vol. 2 of 7, Jury Verdict, 3/25/98.

[11]St. Rec. Vol. 1 of 7, Plea Form (Marquette Grandprix), 8/28/98; Plea Form (Arthur Grandprix), 8/28/98.

[12]St. Rec. Vol. 1 of 7, Plea Form (Marquette Grandprix), 8/28/98; Plea Form (Arthur Grandprix), 8/28/98.

Thereafter, on September 4, 1998, the state trial court sentenced McKinsey to serve life in prison, without benefit of parole, probation or suspension of sentence.[13]  The court also denied McKinsey's motion to reconsider the sentence.  Although his counsel moved for an appeal at the sentencing hearing, McKinsey was later granted an out-of-time appeal on June 29, 1999.[14]

On appeal, McKinsey's appointed counsel argued two errors:[15] (1) A threat made to a juror was communicated to the other jurors giving rise to a presumption of prejudice that the State did not overcome. (2) Trial counsel's ineligibility to practice law at the time of trial gave rise to a per se violation of the Sixth Amendment right to counsel.  On January 17, 2001, the Louisiana Fourth Circuit affirmed McKinsey's conviction, finding no merit in either claim.[16]

On January 25, 2002, the Louisiana Supreme Court denied McKinsey's writ application to that court without stated reasons.[17]  McKinsey's conviction became final

---

[13]St. Rec. Vol. 1 of 7, Sentencing Minutes, 9/4/98.

[14]Id.; St. Rec. Vol. 1 of 7, Minute Entry, 6/9/99.

[15]St. Rec. Vol. 6 of 7, Appeal Brief, 2000-KA-0406, 5/15/00.

[16]State v. McKinsey, 779 So.2d at 993; St. Rec. Vol. 6 of 7, 4th Cir. Opinion, 2000-KA-0406, 1/17/01.

[17]State v. McKinsey, 806 So.2d 667 (La. 2002); St. Rec. Vol. 4 of 7, La. S. Ct. Order, 2001-K-0447, 1/25/02; St. Rec. Vol. 6 of 7, La. S. Ct. Writ Application, 01-K-0447, 2/20/01 (postmarked by counsel on 2/16/01, dated 2/16/01); St. Rec. Vol. 2 of 7, La. S. Ct. Letter, 2001-K-0447, 2/20/01 (showing postal meter of 2/16/01).

90 days later, on April 25, 2002, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On January 21, 2003, McKinsey's counsel filed an application for post-conviction relief, along with motions for production of tapes and other portions of the record.[18]  In the application, counsel asserted 12 grounds for relief:[19] (1) Petitioner was denied due process and a fair trial because the prosecution failed to provide material, relevant impeachment and exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995). (2) Petitioner was denied equal protection, due process and a fair cross-section of the community because of race and gender discrimination in the grand jury selection. (3) Petitioner was denied equal protection and due process because La. Code Crim. P. art. 413(C) was an unconstitutional local and special law. (4) Petitioner was denied equal protection, due process and a cross-section of the community because of the unlawful, unconstitutional and improper exclusion of qualified individuals from eligibility to serve on the grand

---

[18]St. Rec. Vol. 1 of 7, Minute Entry, 1/21/03.

[19]St. Rec. Vol. 5 of 7, Application for Post-Conviction Relief, 1/21/03.

jury. (5) Petitioner was denied equal protection, due process and a cross-section of the community because of other improprieties in the manner in which the grand jury was manipulated in Orleans Parish. (6) Trial counsel failed to ensure that a complete record of the proceedings was transcribed, and appellate counsel failed to obtain missing portions of the record, to reconstruct the record or to raise the state of the record as an issue on appeal. (7) Petitioner was denied effective assistance of counsel in that numerous incidents of ineffectiveness resulted in a manifest absence of counsel and that counsel's deficient performance justifies a finding of cumulative prejudice. (8) He was denied a fair trial and due process when the State used unduly suggestive identification procedures to secure a positive identification. (9) The life sentence is arbitrary, capricious, disproportionate and excessive because the person who actually fired the fatal shot received only 25 years in prison. (10) He was denied due process and a fair trial due to prosecutorial misconduct. (11) The sentence is cruel, unusual and excessive under the Eighth Amendment. (12) The cumulation of errors renders his conviction unconstitutionally unreliable.

In response to this application for post-conviction relief, the State argued that McKinsey's claims addressing the grand jury composition were waived for lack of a

pretrial motion to quash.[20]  The State also argued that the preliminary hearing, several bench conferences, voir dire, opening statements, closing arguments and jury instructions were not transcribed because there were no objections made during those proceedings and no transcript was required since any error in those proceedings was waived.  The State further argued that the challenge to McKinsey's sentence was barred from post-conviction review under State ex rel. Melinie v. State, 665 So.2d 1172 (La. 1996).  The State further contended that the remaining claims were meritless.

At a hearing held more than five years later on April 30, 2008, the state trial court denied the application for post-conviction relief.[21]

McKinsey's counsel filed a writ application in the Louisiana Fourth Circuit seeking review of this ruling and the post-conviction claims raised in the trial court.[22] McKinsey was granted leave to file a supplement to the writ application to argue that the application should be remanded to the state trial court for an evidentiary hearing.[23]

On September 11, 2008, the Louisiana Fourth Circuit denied relief, finding that the reasons given in the State's response adequately supported the state trial court's

---

[20]St. Rec. Vol. 5 of 7, State's Response, 8/15/03.

[21]St. Rec. Vol. 5 of 7, Docket Entry, 4/30/08; Rec. Doc. No. 3-4, p. 68, Minute Entry, 4/30/08.

[22]St. Rec. Vol. 5 of 7, 4th Cir. Writ Application, 2008-K-0788, 6/18/08. Counsel prudently combined the related excessive sentence claims numbered 9 and 11, leaving only 11 claims for the appellate court to review.

[23]St. Rec. Vol. 5 of 7, Motion to Supplement, 2008-K-0788, 8/28/08.

ruling and were dispositive of the claims.[24]  The Louisiana Supreme Court subsequently denied McKinsey's writ application without reasons on October 2, 2009.[25]

## II.    FEDERAL HABEAS PETITION

On December 22, 2009, the clerk of court filed this petition for federal habeas corpus relief in which he asserts four grounds for relief:[26] (1) He was denied the right to a fair trial because of inappropriate communication with a juror that tainted the entire jury and required a mistrial. (2) He was denied the right to adequate trial counsel because counsel was ineligible to practice law for failure to comply with his continuing legal education requirements. (3) Counsel provided ineffective assistance in failing to present exculpatory information from a co-defendant, interview witnesses, impeach the State's eyewitnesses, and object to the state trial court's response to a jury question during deliberations. (4) The State withheld impeachment evidence and exculpatory statements in the form of pretrial statements made by eyewitnesses and members of the victim's family.

---

[24]St. Rec. Vol. 5 of 7, 4th Cir. Order, 2008-K-0788, 9/11/08.

[25]State v. McKinsey, 18 So.3d 103 (La. 2009); St. Rec. Vol. 6 of 7, La. S. Ct. Writ Application, 08-KP-2463, 10/10/08 (delivered by hand).

[26]Rec. Doc. No. 3.

The State filed an answer and memorandum in opposition to McKinsey's petition arguing that the claims are without merit.[27]

III.   GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[28] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to McKinsey's petition, which, for reasons discussed below, is deemed filed in this federal court on December 10, 2009.[29]

---

[27]Rec. Doc. No. 14.

[28]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[29]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed McKinsey's petition on December 22, 2009, when the filing fee was paid.  McKinsey's signature on the petition and memorandum in support are dated December 10, 2009. I consider this the earliest date on which he could have delivered the pleadings to prison officials for mailing. The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition. See Cousin v. Lensing, 310 F.3d 843 (5th Cir. 2002) (mailbox rule applies even if inmate did not pay the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

The threshold questions in habeas review under the AEDPA are whether the petition is timely filed and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  In this case, the State has addressed only the merits of the claims, thereby conceding, as I find, that the federal petition was timely filed,[30] the claims are exhausted and none are in procedural default.

IV.   STANDARDS OF A MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and

---

[30]The long time period between McKinsey's conviction and presentation of his claims to this court is attributable in large part to the five-year delay in determination of his state court application for post-conviction relief between 2003 and 2008.

14

the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93; Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

15

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

## V.  UNFAIR TRIAL / TAINTED JURY (CLAIM NO. 1)

McKinsey alleges that the State failed to overcome the presumption of prejudice arising from a threat made to a juror on the night before deliberations.  McKinsey argues that the contact between his brother and one of the jurors was perceived as threatening and created a presumption of prejudice that should have resulted in a mistrial.[31]  He argues that the trial court's removal of the threatened juror and the two juror votes ultimately returned against the guilty verdict were not adequate to demonstrate that the prejudice had been overcome.  He contends that the Louisiana appellate court erred in finding that the State met its burden of proving that the threat did not prejudice him or warrant a mistrial.

---

[31]Rec. Doc. No. 3-2, Memorandum, p. 43.

Although the State and McKinsey failed to provide this court with a copy of the trial transcript or relevant portions of it, the existing record and McKinsey's pleadings are adequate for this court to address the issue.  The facts concerning the threat and the state trial court's response to it are not in dispute and are clearly outlined by the Louisiana Fourth Circuit in its opinion on direct appeal, which is referenced both by McKinsey and the State in their written submissions.

The record reflects that "on the second day of trial, after the court charged the jury, and after court had adjourned for the evening[,] [a] man believed to be [McKinsey's] brother approached one of the jurors and said, 'Next time, I don't want to see you sleeping in the box.'"[32]  The juror reported the incident to the state trial court and upon questioning in front of counsel, the juror indicated that he was afraid and could not be fair in his deliberations.  The juror also reported that he had informed the other jurors of what happened.  Defense counsel moved for a mistrial, and the court denied the request.  Instead, the court released the threatened juror and replaced him with an alternate.[33]  Before deliberations, the court also questioned the other jurors about the impact of the incident on their ability to proceed.  Eleven of the jurors indicated that they would not

---

[32]State v. McKinsey, 779 So.2d at 998; St. Rec. Vol. 6 of 7, 4th Cir. Opinion, 2000-KA-0406, p.9, 1/17/01.

[33]Id., 779 So.2d at 998.

be influenced by the incident.  The twelfth juror was not sure how the event might affect her vote.[34]

The court gave the jury a cautionary instruction before deliberations, directing the jurors that the incident could not be held against McKinsey.[35] After the verdict of guilty by a 10-2 vote was returned, the trial court noted for the record that one of the two jurors who did <u>not</u> vote in favor of the guilty verdict, was the juror who had been unsure about the effect of the incident on her vote.[36]

McKinsey's counsel raised denial of the mistrial on direct appeal, arguing that prejudice arising from the incident caused the trial to be unfair and required a mistrial under Louisiana law.  The Louisiana Fourth Circuit denied relief on this claim finding that, in light of the actions taken by the trial court and the breakdown of the 10-2 guilty verdict, the State had met its burden to prove that the outside influence did not prejudice McKinsey or cause an unfair trial.[37]  This was the last reasoned opinion by a state trial court on this issue.

The Due Process Clause guarantees an accused the right to an impartial jury that will determine guilt based on the evidence and the law as instructed, rather than on

_____

[34]<u>Id.</u>

[35]<u>Id.</u> at 999.

[36]<u>Id.</u>

[37]<u>Id.</u> at 999-1000.

18

preconceived notions or extraneous information.  Morgan v. Illinois, 504 U.S. 719, 726-27 (1992); Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984).  To prevail on a claim of denial of due process because of a contaminated jury panel, the petitioner must demonstrate prejudice by establishing the actual existence of an opinion that will raise a presumption of partiality in jurors' minds.  Murphy v. Florida, 421 U.S. 794, 800 (1975); Chavez v. Cockrell, 310 F.3d 805, 811 (5th Cir. 2002). Due process also requires the trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial."  Remmer v. United States, 347 U.S. 227, 230 (1954)).

A trial judge should normally undertake assessment of prejudicial impact by questioning jurors directly, with the participation and input of counsel. Smith v. Phillips, 455 U.S. 209, 217 (1982).  Whether a jury was impartial "is a question of federal law; whether a juror can in fact do that is a determination to which habeas courts owe special deference."  Patton, 467 U.S. at 1036-37 & n.12.  Thus, the effect of an extraneous communication on a juror's impartiality is a question of "historical fact," Rushen v. Spain, 464 U.S. 114, 120 (1983); Patton, 467 U.S. at 1036-37, and the state courts' determinations in that regard are entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1).

In McKinsey's case, the state trial court made all constitutionally required inquiries, cautionary instructions and fact findings.  The court questioned the threatened

juror and all other jury members, including the alternate who replaced the threatened juror, who was excused.  The state courts determined based on the jurors' responses that eleven of the jurors had assured the trial court that the incident would <u>not</u> impact their ability to deliberate fairly. This finding is entitled to deference, and there is nothing in the record to contradict it.

On direct appeal, the Louisiana appellate court also found that any presumption of prejudice had been rebutted in light of the trial court's removal of the targeted juror and confirmation that the remaining jurors would not be improperly influenced in their verdict.  Significantly, with regard to the one unsure juror, the appellate court, like the trial court, emphasized the fact that she did <u>not</u> vote for the guilty verdict.  The court also noted that another juror who had indicated that he would not be influenced also did not vote for the guilty verdict.  The appellate court found that the measures taken by the trial court and the results of the jury verdict poll were sufficient to rebut any inference of possible prejudice.

McKinsey has made no showing of prejudice or that any of the jurors had an opinion or mindset to support the presumption of partiality.  The threatened juror was excused.  The one uncertain juror voted in McKinsey's favor.  All jurors who voted guilty were found by the state court after examination to have been unaffected by the incident in their ability to remain impartial. A federal habeas court will not readily

presume that a juror is biased solely on the basis that he or she has been exposed to prejudicial information about the defendant outside the courtroom.  Willy v. Maggio, 737 F.2d 1372, 1379 (5th Cir. 1984)(citing Smith v. Phillips, 455 U.S. 209, 210-11 n.1 (1982) (O'Connor, J., concurring)).  In McKinsey's case, the state courts found as a matter of fact that the threat to a single juror, although made known to the other jurors, did not prejudice the remaining jurors or impact the verdict against him.  The trial court established for the record that the remaining jurors would not hold the incident against McKinsey or allow it to influence their deliberations.  As for the one unsure juror, her vote against the guilty verdict indicates that no prejudice to McKinsey occurred and that the trial court's instructions that the jurors must disregard the incident was effective.

For these reasons, the state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law.  McKinsey is not entitled to relief on this claim.

VI.   INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIMS NOS. 2 AND 3)[38]

McKinsey alleges that his counsel provided ineffective assistance based on alleged errors during trial and in preserving or preparing the record for appeal.  The issue of

---

[38]I note that the State's response to McKinsey's federal petition included arguments addressing claims not raised in McKinsey's submissions, including for example: (1) ineffective assistance of counsel for failure to insure a complete record for appeal (Rec. Doc. No. 14, pp. 18, 20), failure to communicate with him, pursue a plea bargain, and properly prepare a defense (id., p. 19), failure to file a motion to suppress and only filing four pretrial motions (id.), and failure to redact his statement (id.). Even under the broadest of readings, none of these claims were raised by McKinsey in this court, and there is no reason for this court to consider any such claims.

ineffective assistance of counsel was raised both on direct appeal and on post-conviction review. The state courts denied relief on the merits of these claims, although without stated reasons.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009). Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive <u>Strickland</u> standard, but may dispose of the claim based solely on a petitioner's failure to meet either prong of the test.  <u>Kimler</u>, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'  It is not enough under <u>Strickland</u>, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Motley</u>, 18 F.3d at 1226 (quoting <u>Strickland</u>, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689-90).  In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial.  <u>Strickland</u>, 466 U.S. at 689; <u>Neal v. Puckett</u>, 286 F.3d at 236-37; <u>Clark v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001).  "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or

omission of counsel was unreasonable in the harsh light of hindsight." <u>Bell</u>, 535 U.S. at 697 (citing <u>Strickland</u>, 466 U.S. at 689).

This court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 690.  Federal courts have consistently recognized that tactical decisions supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1013 (1999) (citing <u>Rector v. Johnson</u>, 120 F.3d 551, 564 (5th Cir. 1997) and <u>Mann v. Scott</u>, 41 F.3d 968, 983-84 (5th Cir. 1994)).  Trial strategy is presumed objectively reasonable unless clearly proven otherwise.  <u>Strickland</u>, 466 U.S. at 689; <u>Moore v. Johnson</u>, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient.  <u>Id</u>.

A.    <u>FAILURE TO INVESTIGATE OR INTERVIEW MEGAT AND HIS COUNSEL</u>

McKinsey alleges that Megat's lawyer stated in her opening argument that Megat a/k/a Marquette Grandprix[39] picked McKinsey up a few blocks from the crime scene after the shooting.  McKinsey argues that if his counsel had interviewed Megat, he could have presented his testimony to establish that McKinsey was not at the shooting.  McKinsey

---

[39]Although McKinsey failed to identify which co-defendant was known as "Megat," the record indicates that this particular lawyer, Shelly Vix, represented Marquette Grandprix. <u>See e.g.</u>, St. Rec. Vol. 1 of 7, Trial Minutes, 3/3/97; Docket Entry, 2/28/97.

also references an affidavit signed by Megat on November 14, 2009, in which he indicates that he was willing to testify that McKinsey was not involved in the murder.[40] The state courts denied relief on this claim on the merits during post-conviction review.

At the outset, this court will not consider the alleged affidavit from Marquette "Megat" Grandprix.  In recent weeks, the United States Supreme Court has emphatically held "that evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  Cullen v. Pinholster, 131 S. Ct. 1388, 1400 (2011) (rejecting in part its prior opinion in Holland v. Jackson, 542 U.S. 649 (2004), which allowed a habeas court to consider new evidence in § 2254(d) review under certain circumstances).  In reaching its decision, the Supreme Court recognized that Section 2254(d) applies by its very terms to claims "adjudicated on the merits in State court proceedings."  Id. at 1401 (quoting 28 U.S.C. § 2254(d)).  Thus, where a claim is denied on the merits in the state courts, a federal court's habeas review is limited to the record that was before the state court.

In this case, the record reflects that Megat's affidavit was not part of the post-conviction pleadings or record submitted to the state courts.  The affidavit is dated November 14, 2009, and notarized on November 19, 2009.  This was more than one

---

[40]Rec. Doc. No. 3-7, p. 45.

month after the Louisiana Supreme Court denied relief on McKinsey's post-conviction

writ application on October 2, 2009.  These dates and the record confirm that this

affidavit was not presented to the Louisiana courts in connection with the post-conviction

review of this claim.  For these reasons, I will not consider the affidavit in addressing

whether the state courts' denial of relief was contrary to or an unreasonable application

of Strickland.

As a general rule, "'[c]omplaints of uncalled witnesses are not favored, because

the presentation of testimonial evidence is a matter of trial strategy and because

allegations of what a witness would have testified are largely speculative.'"  Graves v.

Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575

F.2d 515, 521 (5th Cir. 1978)).  "'Failure to present [evidence does] not constitute

'deficient' performance within the meaning of Strickland if [counsel] could have

concluded, for tactical reasons, that attempting to present such evidence would be

unwise.'"  Williams v. Cockrell, 31 Fed. Appx. 832 (5th Cir. 2002) (quoting Williams

v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).

In this instance, Marquette "Megat" Grandprix and Arthur Grandprix were initially

McKinsey's co-defendants.  Counsel for both sides persistently argued for and obtained

severance of the trials, which was granted as to McKinsey by the state trial court at a

hearing held on October 27, 1995.[41]  McKinsey alleges that, during the Grandprix trial which ended in mistrial, Megat's counsel indicated that Megat picked McKinsey up a couple of blocks from the shooting.

McKinsey suggests that this should have caused his counsel to interview Megat or his counsel to determine and confirm that McKinsey was picked up away from the scene of the killing.  McKinsey suggests that this reference necessarily meant <u>after</u> the shooting, which would tend to show that he was not at the victim's home.  Thus, he claims that his counsel's failure to call Megat or his counsel to testify was deficient performance and prejudicial to the defense.

At the time of McKinsey's trial(s), Megat had not been tried to verdict nor had he entered his later guilty plea to manslaughter.  There was nothing in the record before the state courts to indicate that at that time, Megat would have been inclined to testify (while a murder charge was pending against him) or to testify favorably to McKinsey or that his counsel could have provided any assistance to McKinsey's case.  Under the circumstances, counsel's decision not to call Megat or his counsel was within the realm of reasonable trial strategy.

There is no indication that the verdict against McKinsey would have been any different even with Megat's testimony.  His alleged testimony would have been

---

[41]St. Rec. Vol. 1 of 7, Minute Entry, 10/27/95.

cumulative of other testimony already before the jury.  Although I do not have the benefit of the trial transcripts, the record along with the federal pleadings provide adequate summaries of the trial testimony, none of which is in dispute.  The record reflects that McKinsey's counsel in fact presented a witness at trial, Chris Kelly, who testified that he picked up McKinsey, whom he knew as Peanut, as he was walking down the street. Kelly testified that he and McKinsey were together when they heard popping sounds or gunshots and that, shortly thereafter, a car pulled up behind them, and McKinsey got out of Kelly's car and got into the other car, which drove off.

McKinsey also testified on his own behalf that Kelly picked him up while he was walking to get ice cream.  He stated that once he was in Kelly's car, he learned that Kelly was not going in his direction.  He said that he then saw Megat's car come around the corner, and he flagged Megat down.  Once in the car, he said he heard gunshots and he stayed down until the police showed up.  He denied any knowledge of the shooting or being at the Lewis home.

The jury therefore had before it testimony that would have supported McKinsey's theory that he was not at the Lewis home during the killing and that he was picked up away from the murder scene.  The guilty verdict indicates that the jury did not find this testimony credible.  It is unlikely that the jury's verdict would have been different had counsel called Megat to testify as to the same or similar information, even assuming he

would have testified in the posture of his own case at that time, when he was facing a first degree murder charge.

Without such a showing, McKinsey has not established that counsel was deficient or prejudicial in this regard. The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, <u>Strickland</u>.  McKinsey is not entitled to relief on this claim.

B.    <u>COUNSEL'S INELIGIBILITY TO PRACTICE LAW</u>

McKinsey alleges that his counsel was ineffective because he was ineligible to practice law at the time he was representing McKinsey. Counsel made his first appearance of record with McKinsey at a hearing on June 1, 1995.[42]   The record establishes that Gibson was ineligible to practice law for one week from September 6 through 13, 1995 for failure to pay his Louisiana State Bar Association membership dues.[43]   He was again ineligible from August 8, 1997 through May 5, 1998, for non-compliance with the mandatory continuing legal education ("CLE") requirement.[44] Both of McKinsey's trials occurred during the latter period.

---

[42]St. Rec. Vol. 1 of 7, Docket Entry, 6/1/95.

[43]Rec. Doc. No. 3-4, pp. 48, 49.

[44]<u>Id</u>.

29

McKinsey filed a bar complaint against his lawyer for representing him while he was ineligible.[45]  As a result, his counsel received a private admonition and was assessed costs by the Louisiana Attorney Disciplinary Board.[46]  McKinsey also notes that his lawyer was later permanently disbarred by the Louisiana Supreme Court based on 12 grounds of misconduct arising from client relationships unrelated to McKinsey.  In re Gibson, 773 So.2d 691 (La. 2000) (disbarment ordered); In re Gibson, 856 So.2d 1173 (La. 2003) (permanent disbarment ordered); State v. Gibson, 867 So.2d 793 (La. App. 4th Cir. 2004) (criminal charges of theft and unauthorized practice of law).

On direct appeal, McKinsey's counsel challenged the state trial court's denial of a motion for new trial based on his former counsel's ineligibility.  The Louisiana Fourth Circuit denied relief, finding that McKinsey had cited no law to support the suggestion that counsel was constitutionally ineffective for failing to comply with CLE requirements and because McKinsey had not particularized any acts or omissions by his counsel resulting from his CLE noncompliance.  The court also found that the record established that counsel ably represented McKinsey throughout all stages of the proceeding and trial. The issue of ineffective assistance was asserted on post-conviction review, and the state courts again denied relief, finding no merit in the claim.

---

[45]Rec. Doc. No. 3-4, p. 51.

[46]Rec. Doc. No. 3-4, pp. 51-53.

The United States Fifth Circuit has recognized, citing Second Circuit precedent, that a per se rule that the Sixth Amendment right to counsel was violated exists where, unknown to a defendant, his counsel was at the time of trial not licensed to practice law because of a "failure <u>ever</u> to meet the substantive requirements for the practice of law," or was implicated in the defendant's crimes.  <u>Bellamy v. Cogdell</u>, 974  F.2d 302, 306 (2d Cir. 1992), <u>cert. denied</u>, 507 U.S. 960 (1993) (emphasis added).  The Fifth Circuit has also held that an attorney's suspension from the practice of law for failure to meet technical requirements, such as paying bar dues and acquiring CLE, does <u>not</u> constitute a per se Sixth Amendment violation.  <u>United States v. McKinney</u>, 53 F.3d 664, 675 (5th Cir. 1995) (failure to meet continuing legal education requirements is <u>not</u> a per se violation); <u>United States v. King</u>, 52 F.3d 1067, 1067 (5th Cir. 1995) (same); <u>Beto v. Barfield</u>, 391 F.2d 275, 275-276 (5th Cir.), <u>cert. denied</u>, 393 U.S. 888 (1968) (no entitlement to federal habeas corpus relief based upon fact that petitioner was represented by counsel suspended from law practice due to failure to pay bar membership dues); <u>Reese v. Peters</u>, 926 F.2d 668, 669-670 (7th Cir. 1991) (no Sixth Amendment violation due to counsel's suspension from the bar due to his failure to pay dues).

The record is undisputed that McKinsey's counsel, at the time of trial, was ineligible to practice law in the State of Louisiana.  His ineligibility, however, was not the result of his failure to meet a substantive requirement, such as graduation from law

school or passing the initial bar exam or other admission and licensing standards. Rather, his two relevant periods of suspension were for the technical failures to pay bar dues and complete CLE requirements. This is neither a per se violation nor a denial of competent counsel under the Sixth Amendment.

Thus, for McKinsey to establish denial of counsel under the Sixth Amendment, he would have to satisfy the Strickland requirements. McKinsey has not specified a particular deficiency on the part of counsel that prejudiced him. Relying on the Strickland standard, the state appellate court made the determination that counsel exhibited a "command of the law and facts" and "ably represented the defendant through all stages of the case and trial."[47] Based upon my review of the record, and McKinsey's other grounds in support of his ineffective assistance of counsel claim, I find that McKinsey has failed to satisfy either of Strickland's two prongs in this regard.

Accordingly, his ineffective assistance of counsel claim based upon counsel's ineligibility to practice law is without merit. The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Strickland. McKinsey is not entitled to relief on this claim.

---

[47] State v. McKinsey, 779 So.2d at 1001; St. Rec. Vol. 6 of 7, 4th Cir. Opinion, 2000-KA-0406, p. 14, 1/17/01.

C.    FAILURE TO MOVE FOR MISTRIAL AND IMPEACH STATE'S EYEWITNESS

McKinsey argues that his counsel was ineffective because he failed to move for mistrial under La. Code Crim. P. art. 770 when the prosecution quoted from Gary Lewis's pretrial statement and the defense had been denied a copy of the statement three years earlier.  He also complains that, once the statement was disclosed and used at trial, counsel failed properly to impeach Lewis's testimony with the statement.

McKinsey has failed to establish that counsel had a basis to move for a mistrial under La. Code Crim. P. art. 770, which provides:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
> (3) The failure of the defendant to testify in his own defense; or
> (4) The refusal of the judge to direct a verdict.
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

Use of Gary Lewis's statement at trial did not fall within the grounds for mistrial provided in Article 770.  Counsel was not deficient in failing to move for a mistrial that was without a legal basis under that provision.  See Green v. Johnson, 160 F.3d 1029,

33

1037 (5th Cir. 1998), cert. denied, 525 U.S. 1174 (1999) (failure to make a frivolous objection is not deficient performance below an objective level of reasonableness).

Louisiana law would also have permitted a mistrial to be ordered where "[t]here is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law." La. Code Crim. P. art. 775(3).  Because McKinsey has raised a Brady claim in connection with Gary Lewis's statement, I will also consider whether counsel should have moved for mistrial under this provision.

The record establishes that the content of Gary Lewis's pretrial statement to police was made known to the defense during pretrial motions.  The record reflects that Gary Lewis and the officer who took his statement testified during a hearing on various pretrial motions, including motions for discovery and to suppress.  He also was cross-examined by the defense.[48]

Upon continuation of the motion hearing on October 20, 1995, defense counsel asked the court to have a copy of Gary Lewis's pretrial statement to police made available to the defense.[49]  In response, the state trial court agreed to conduct an in

---

[48]St. Rec. Vol. 1 of 7, Minute Entry, 10/9/05; see also, Minute Entry, 9/21/95.

[49]Rec. Doc. No. 3-7, p. 36.

camera review of the statement to determine if it contained anything exculpatory.[50] After

doing so, the state trial court made the following ruling:[51]

> The Court has completed an in camera inspection privately in the chambers of the Court, of the documents that the State has given me concerning the alleged information in the form of a written statement by Mr. Gary Lewis to the police. Based on my review of that statement, as well as the alleged observations the gentleman has made in this courtroom and the testimony he has given, I find nothing of an exculpatory nature that would cause the Court to have to order the revelation and the turning over for discovery of this statement. It does not prejudice the State in any way to tell the defense that clearly, in the statement Mr. Lewis again refers to this mask or masks as being Flintstone like characters, if you will. He specifically uses that word "Flintstone", as he did here in Court. I just mention that for whatever it's worth. His testimony is basically consistent throughout with what he told the police allegedly. Whether any or all of that is true, of course, just for the record as I point out, that remains to be seen. I note an objection as to the denial of any request for the Court to turn over the statement of Mr. Gary Lewis and/or any other alleged witness.

Thus, the state trial court declined the defense's request to have Lewis's statement

produced. The statement was not secretly withheld by the prosecution. Rather, the state

trial court reviewed the statement and found it consistent with Lewis's testimony at the

motion hearing, at which Lewis was subject to cross-examination by McKinsey's

counsel.

McKinsey has not established a violation of <u>Brady</u> or any other legal error which

would have called for a mistrial under La. Code Crim. P. art. 775(3) when Gary Lewis's

---

[50]<u>Id.</u>, p. 38.

[51]<u>Id.</u>, pp. 41-42.

statement was used by the State at trial.  Without some showing at that level, counsel did not err in failing to move for a mistrial where there was no legal or factual basis for such a motion.  Green, 160 F.3d at 1037.

McKinsey also suggests that counsel failed to cross-examine Gary Lewis about the statement once it was used at trial.  McKinsey claims that, at trial, Lewis testified that he elbowed McKinsey in the face.  In the statement, however, Lewis indicated that the man he elbowed in the face was the slimmer man who was holding him.  Counsel was able to review the pretrial statement during trial, and did not cross-examine Lewis about this alleged inconsistency.

McKinsey has not established that counsel's decision not to cross-examine Lewis about which man he elbowed was anything other than sound trial strategy consistent with the defense theory of misidentification.  A reading of the statement reflects that Lewis told police that the stocky man with the fade haircut (who is later identified as McKinsey) was the one who shot and killed Eric Lewis.[52]  Gary Lewis also told police that he elbowed the shorter, slimmer man, who was holding him and who tried to shoot Lance Lewis as he exited the bathroom.[53]  The thrust of the defense strategy at trial was to argue that McKinsey was <u>not</u> at the scene of the murder and could not have

---

[52]Rec. Doc. No. 3-4, p. 13-14.

[53]<u>Id</u>.

participated in the shooting. If Gary Lewis testified at trial that McKinsey was the man he elbowed, that would have emphasized to the jury that McKinsey in fact was at the scene in one place or the other.  If counsel would have vigorously addressed this issue, it may have given the witness an opportunity to clarify his testimony, thereby undermining counsel's ability to argue misidentification and challenge the identification of McKinsey as having been at the scene.  This clearly falls within the ambit of reasonable trial strategy.  Strickland, 466 U.S. at 689 (federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise); Moore v. Johnson, 194 F.3d at 591.

The fact that counsel's defense strategy was not successful does not render his performance unconstitutionally deficient.  See Martinez v. Dretke, 99 Fed. Appx. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted).

McKinsey has failed to meet either prong of the Strickland standard arising from counsel's actions with regard to the witness Gary Lewis.  The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Strickland. McKinsey is not entitled to relief on this claim.

D.      FAILED TO OBJECT TO JURY INSTRUCTION DURING DELIBERATIONS

McKinsey alleges that during deliberations the jury asked the state trial court, "On a second degree charge, how do we express a penalty of less than a life sentence or is there such a penalty?"[54]  The state trial court answered the jury by explaining, among other things, the governor's power to pardon or commute a life sentence.[55]  McKinsey argues that counsel erred in allowing the state trial court to instruct the jury in that way instead of instructing them on the available lesser offenses.  He also complains that this left the jury with the impression that a life sentence truly was not for life.

Neither McKinsey nor the State have provided this court with a complete recitation of the state trial court's answer to the jury's question to provide context to the questioned portion of the answer.  Nevertheless, "[a] trial judge enjoys wide latitude in deciding how to respond to a question from a jury." United States v. Mann, 161 F.3d 840, 864 (5th Cir. 1998) (citing United States v. Stevens, 38 F.3d 167, 170 (5th Cir. 1994)).  The court's answer should be reasonably responsive to the jury's question and, in light of the instructions as a whole, allow the jury to understand the issues presented. United States v. Ehrlich, 902 F.2d 327, 330 (5th Cir.1990).

---

[54]Rec. Doc. No. 14, pp. 29, 43.

[55]Id., p. 43.

McKinsey has not established that the state trial court's response to the jury question was anything other than responsive to the question regarding the life sentence. Thus, McKinsey has established no basis upon which his counsel may have objected. Furthermore, the United States Supreme Court has recently clarified that, on habeas review under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, 131 S.Ct. 770, 788 (2011). McKinsey has not established that level of incompetence in counsel's performance.

The Harrington Court reiterated the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

On the record before this court, McKinsey has not demonstrated that counsel acted deficiently or that prejudice arose from his failure to object to the state trial court's response to the jury's question. There is no basis for this court to assume that the jury meant to ask for instructions on lesser included offenses, especially in light of its preface

to the question referencing "[o]n a second degree murder charge."[56] The answer addressed the question asked and was not objectionable under the discretion afforded the state trial court, and his counsel did not violate the <u>Strickland</u> standard by failing to object to it.  Accordingly, McKinsey is not entitled to relief on this claim.

VII.    <u>IMPEACHMENT AND EXCULPATORY EVIDENCE (CLAIM NO. 4)</u>

McKinsey alleges that the State withheld material and relevant impeachment and exculpatory evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Specifically, he alleges that the State suppressed the pretrial statements of Leonard West, Dana Lewis, Gary Lewis, Darryl Lewis, Lance Lewis and Joseph Harris.  McKinsey argues that each statement contains something that was inconsistent with the trial testimony and that would have impeached witness credibility or been favorable to the defense.

The United States Supreme Court has held that suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  <u>Brady</u>, 373 U.S. at 87; <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006).  Three factors must be considered to evaluate an alleged <u>Brady</u> violation: (1) The evidence at issue must be favorable to the accused, either because it is

---

[56]<u>Id</u>., p. 29.

exculpatory or because it is impeaching. (2) The evidence must have been suppressed by the State, either willfully or inadvertently. (3) Prejudice must have ensued.  Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

Evidence is material under Brady "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Kyles, 514 U.S. at 433.  The United States Fifth Circuit recently outlined four factors used to determine materiality under Brady and Kyles:

> The Kyles decision emphasizes four aspects of materiality.  First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)."  514 U.S. at 434, 115 S.Ct. 1555.  The question is not whether the defendant would have received a different verdict with the disclosed evidence, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Id.  A "reasonable probability of a different result" is shown when the suppression "undermines confidence in the outcome of the trial."  Id.
> Second, the materiality test is not a test of the sufficiency of the evidence.  The defendant need not demonstrate that after discounting the inculpatory evidence by the undisclosed evidence that there would not have been enough evidence to sustain the conviction.  Rather, a Brady violation is established by showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Id. at 435, 115 S.Ct. 1555.  Third, harmless error analysis does not apply.  Id.  Fourth, "materiality to be stressed here

is its definition in terms of suppressed evidence considered collectively, not item by item." Id. at 436, 115 S.Ct. 1555.

Graves v. Dretke, 442 F.3d 334, 339-40 (5th Cir. 2006); Kyles, 514 U.S. at 433-44.

Brady applies equally to evidence relevant to the credibility of a key witness in the State's case against a defendant. Giglio v. United States, 405 U.S. 150 (1972); Youngblood, 547 U.S. at 869-70. The prosecution's suppression of impeachment evidence requires a showing that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" United States v. Holley, 23 F.3d 902, 914 (5th Cir. 1994) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

Brady claims include "'the discovery of evidence after trial of information which had been known to the prosecution but unknown to the defense.'" Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)) (emphasis added). However, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim." United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980). Brady does not place any burden on the prosecution to conduct a defendant's investigation or assist in the presentation of the defense. United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990) (citations omitted);

Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997) (the State has no duty to lead the defense toward potentially exculpatory evidence if the defendant possesses the evidence or can discover it through due diligence); Bigby v. Cockrell, 340 F.3d 259, 279 (5th Cir. 2003); Kutzner v. Cockrell, 303 F.3d 333, 336 (5th Cir. 2002).  Information is not material under Brady if it is merely cumulative of other evidence already before the fact finder.  Spence v. Johnson, 80 F.3d 989, 995 (5th Cir. 1996).

In McKinsey's case, the existence of the statements was not hidden from the defense.  As noted previously, the statements were openly discussed in connection with pretrial motions.  During the motion hearings, the state trial court denied the defense's request for discovery as to Gary Lewis's statement and as to all other witnesses.[57]  This was done after the state trial court's in camera inspection of Gary Lewis's statement and the courts' finding that the statement did not contain exculpatory information.

In addition, McKinsey has not established that the statements were material or exculpatory.  He has not established that the verdict would have been different if the statements had been available or had been used for impeachment purposes.

---

[57]Rec. Doc. No. 3-7, pp. 41-42.

A.    PRETRIAL STATEMENT OF LEONARD WEST ON MARCH 14, 1995

McKinsey argues that West's statement contradicted his pretrial statement to police.  According to McKinsey, West testified at trial that he saw several people outside Eric Lewis's house when Eric told him to go back inside the house.  In his pretrial statement, however, he indicated that he saw an unknown black male standing near the corner of the house.[58]

Actually, in his pretrial statement, West told police that the one man standing by the side of the house spoke out to Eric and Eric identified that man as "Peanut."[59] Contrary to McKinsey's arguments, West did not indicate that the man was alone or that no one else was present.  He said nothing in that regard.  His testimony was not contradictory to what McKinsey identifies as his trial testimony.  The statement did not provide impeachment material, since West consistently identified the man as Peanut, and the State established that McKinsey used that nickname.

McKinsey has not established a violation of Brady or Kyles arising from West's statement.  The state courts' denial of relief was not contrary to or an unreasonable application of federal law.

_____

[58]Rec. Doc. No. 3-4, p. 5.

[59]Id.

44

B.    <u>PRETRIAL STATEMENT OF DANA LEWIS ON MARCH 14, 1995</u>

McKinsey strains to find relevance or inconsistency in the fact that Dana Lewis allegedly testified at trial that she came out of her room when she heard things being knocked around in the house, while in her pretrial statement she claimed she heard someone knocking at the door.  He also claims that she testified at trial that she was not able to identify anyone involved, while in her earlier statement she identified Peanut.[60]

McKinsey has not established a material discrepancy in Dana Lewis's statement or testimony with regard to what specific kind of knocking noise caused her to exit her bedroom.  Such information was neither material nor exculpatory to the defense.  This does not form the basis of a Brady or Kyles inquiry.

Dana Lewis's testimony as to the identification was the subject of a pretrial motion by the defense.  In denying the defense motions to suppress the statements and identifications, the court made the following statement:

> Additionally, as it relates to that case, the court denied any request by the defense that Ms. Dana Lewis be precluded from the opportunity to make an alleged possible in court identification of any of the accused at a trial.  What Ms. Dana Lewis may or may not be asked to do, what she might be capable of doing if so requested at trial, remains to be seen.  In additionally [sic], just to protect the record for each defendant would include a denial of any request that there be a pretrial formal or informal

---

[60]Rec. Doc. No. 3-4, p. 10.

line-up procedure to which Ms. Dana Lewis should be subjected as it might relate to any or all of the defendants.[61]

The record indicates that defense counsel was well aware of the fact that Dana Lewis had made an identification to police in her pretrial statement.  The state trial court ruled on the motion to preclude her from doing so at trial.  Although the defense motion was not successful in 1995, Lewis did <u>not</u> make an in court declaration that she recognized Peanut or McKinsey.  In that regard, there was nothing to impeach at trial.  Her identification to police was arguably questionable.  As the State indicates, it was apparently based on hearsay and not attested to at trial.  The questionable identification in the statement was not an issue at trial and her trial testimony was in fact more favorable to McKinsey than her pretrial statement.  Nevertheless, it is apparent from the record that the contents of Dana Lewis's pretrial statement, <u>i.e.</u> her identification of Peanut, was known to the defense and was not suppressed.

McKinsey has not established a violation of <u>Brady</u> or <u>Kyles</u> in this regard.  The state courts' denial of relief was not contrary to or an unreasonable application of federal law.

---

[61]Rec. Doc. No. 3-7, p. 37.

C.   <u>PRETRIAL STATEMENT OF GARY LEWIS ON MARCH 14, 1995</u>

McKinsey alleges that Gary Lewis's pretrial statement indicated that he saw five men with chrome guns.  At trial, however, he testified that he awakened to see four men with guns.  McKinsey also reiterates his arguments, discussed previously, regarding which perpetrator Gary Lewis elbowed during the attack.  He contends that these discrepancies could have been used to impeach Gary Lewis's trial testimony.  He also suggests that the pretrial statement could have been used to show that Gary Lewis heard the name Peanut and assumed it was McKinsey.

As already discussed, the defense was well aware of the existence of Gary Lewis's statement prior to trial.[62]  In 1995, the state trial court declined to require the State to produce the statement to the defense after finding that the statement did not contain exculpatory information.  The trial court, therefore, determined that this was not <u>Brady</u> material.

Nevertheless, as conceded by McKinsey, Gary Lewis's statement was eventually provided to the defense during the second trial, and defense counsel had an opportunity to review and use it at his discretion.  In addition, as discussed above, the statement does not contain anything of material value under either <u>Brady</u> or <u>Kyles</u>.  Even assuming that Gary Lewis testified at trial that he only saw four men that evening, this would not alter

---

[62]Rec. Doc. No. 3-4, pp. 12-15.

the fact that he identified McKinsey or Peanut as one of the men he did see.  As noted above, it was tactically beneficial to the defense trial strategy of misidentification that counsel did not attempt to use the statement to point out that Gary Lewis told police that he elbowed anyone who might have been McKinsey.  This kind of examination by defense counsel may have been construed as indicating that McKinsey was either the shooter or at the scene, when his principal defense was that he was not present at the Lewis house.  The decision not to use the statement, which was by then in the possession of defense counsel, supported the defense theory of misidentification.  Nothing in the pretrial statement was so beneficial to the defense that it may have altered the verdict.

McKinsey has not established his entitlement to relief on this claim. The state courts' denial of relief was not contrary to or an unreasonable application of federal law.

D.    PRETRIAL STATEMENT OF DARRYL LEWIS ON MARCH 14, 1995

McKinsey again points to minor discrepancies, not material exculpatory information, in the statement made by Darryl Lewis and his alleged trial testimony.  In his statement and at trial, Darryl Lewis identified Peanut (McKinsey) as a perpetrator and as the man who shot at him.[63]  There is nothing exculpatory or of impeachment value in the statement. Thus, McKinsey has not identified a violation of Brady or Kyles.  The

---

[63]Rec. Doc. No. 3-4, pp. 17, 18.

state courts' denial of relief was not contrary to or an unreasonable application of federal law.

E.    PRETRIAL STATEMENT OF LANCE LEWIS ON APRIL 3, 1995

McKinsey complains that Lance Lewis gave conflicting addresses in his statement in 1995 and at trial in 1997 and points to other minor differences in his presentation of the events during the assault on his family, such as his brother's reference to "Peanut, Megat and them" versus only "Peanut and Megat."[64]  This is not material exculpatory information and is not relevant impeachment evidence.  McKinsey also notes that Lance Lewis identified a gun and a blanket in which cash was taken by the man who shot him. He seems to argue that no such money or blanket was identified as having been found in the car or introduced as evidence at trial, and this would have been impeachment evidence.

I see no basis on which Lance Lewis's discussion at trial of the money, blanket and gun mentioned in his statement would have benefitted McKinsey's defense.  On the contrary, introduction of such information at trial may have compromised McKinsey by bringing in evidence giving rise to an inference of other bad acts that were not part of the State's case.  None of this would have been in the interest of the defense or have had an influence beneficial to the defense in the verdict.

---

[64]Rec. Doc. No. 3-4, pp. 21-26.

McKinsey has not identified a violation of <u>Brady</u> or <u>Kyles</u> arising from the failure to obtain a copy of Lance Lewis's statement.  The state courts' denial of relief was not contrary to or an unreasonable application of federal law.

F.      PRETRIAL STATEMENT OF JOSEPH HARRIS ON MARCH 15, 1995

McKinsey alleges that Harris gave a pretrial statement to police indicating that he knew that the victim, Eric Lewis, sold cocaine.  He claims that if the defense would have had this statement, it could have been used to challenge each witness who said that Eric Lewis did not sell drugs and to support the defense's argument that Lewis was a drug dealer.  Harris did not testify at trial.

Harris's statement does not definitively indicate that Eric Lewis sold drugs.  The officer asked Harris if there was any illegal drug activity going on in the Lewis house. He answered, "As far as I know of he does sell, but I (sic) going on in the house <u>I don't know of</u>."[65]  When asked what does "he" sell, Harris answered, "I guess rocks as far as I know of."[66]  Harris never indicated who "he" was, although he had mentioned Eric <u>and</u> Lance <u>and</u> the other brothers just prior to this point in his statement.  McKinsey has not shown the relevance of this vague statement to his defense.  Even if Eric Lewis was a drug dealer, that would not have altered the evidence against him in connection with the

---

[65]Rec. Doc. No. 3-4, p. 31 (emphasis added).

[66]<u>Id</u>.

second degree murder charge.  Both sides recognize that the evidence established that Eric Lewis had weapons in his home and that he shot back at McKinsey and the other attackers.  He has not shown that additional testimony regarding Eric Lewis's alleged history of drug activity was material to his defense of innocence and misidentification.

McKinsey has not identified a violation of <u>Brady</u> or <u>Kyles</u>.  The state courts' denial of relief was not contrary to or an unreasonable application of federal law.

## **RECOMMENDATION**

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Derrick McKinsey for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v.</u>

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[67]

New Orleans, Louisiana, this _____13th_____ day of May, 2011.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[67]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.